# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 22-346


**STATE OF LOUISIANA**

**VERSUS**

**JIMMY O'NEAL LEWIS**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 19-1772
HONORABLE JOHN C. REEVES, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JONATHAN W. PERRY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Van H. Kyzar, Johnathan W. Perry, and Sharon Darville Wilson, Judges.


**AFFIRMED.**

**Paula C. Marx**
**Louisiana Appellate Project**
**P. O. Box 82389**
**Lafayette, Louisiana 70598-2389**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
  **Jimmy O'Neal Lewis**

**Honorable Brad Burget**
**District Attorney**
**Seventh Judicial District**
**Joseph A. Boothe**
**First Assistant District Attorney**
**4001 Carter Street**
**Vidalia, Louisiana 71373**
**(318) 336-5526**
**COUNSEL FOR APPELLEE:**
  **State of Louisiana**

**PERRY, Judge.**

In this criminal proceeding, Defendant, Jimmy O'Neal Lewis, appeals his conviction for the first degree murder of Frederick McCray, Jr., the victim. We affirm.

### FACTS AND PROCEDURE

On June 23, 2019, the victim's family contacted Deputy Justin Stevens ("Deputy Stevens") of the Concordia Parish Sheriff's Office, to report that the victim was missing. Through the help of a family tracker app, the family was able to locate the victim's cell phone at the corner of Highway 3232 and Highway 15 in Ferriday. After meeting several members of the victim's family at the intersection, the victim's sister gave Deputy Stevens the passcode to the phone. When Deputy Stevens examined the victim's phone, he discovered a message from the victim's bank regarding possible fraudulent charges involving the victim's credit card at the Walmart in Natchez, Mississippi.

After reviewing surveillance video of an individual using the credit card at Walmart, the police identified and confirmed that Ronald Riley ("Mr. Riley") used the victim's credit card at Walmart. The police then went to Mr. Riley's mother's home, looking for him. After not finding Mr. Riley, they left. Shortly thereafter, Mr. Riley voluntarily came to the police station and gave a statement. He told police that Sedrick Tennessee ("Mr. Tennessee") showed up at his apartment driving a vehicle around seven or eight in the morning on June 23, 2019, asking Mr. Riley for a shirt because his wet.

Later during trial, when the State asked Officer Sam King if Mr. Riley gave them information "that Mr. McCray was murdered by Mr. Lewis and Mr. Tennessee in an armed robbery[,]" the officer replied, "Correct." Mr. Riley said that he joined

Mr. Tennessee in the car, they drove around, and then they washed the vehicle. Mr. Riley said that there was blood in the vehicle and that the vehicle was from a "whole lick." When an officer was asked what a "lick" meant, the officer replied, "It means they are committing a robbery or a theft, they hit a lick[.]" The vehicle would later be identified as belonging to the victim. Mr. Riley said that he went to Walmart where he used the victim's credit card that he took from inside the victim's car. Based on information Mr. Riley provided about a potential location of the victim's body, the investigation turned into the investigation of a possible homicide. At Defendant's trial, Mr. Riley admitted that he pled guilty on September 30, 2020, to accessory after the fact to first degree murder.

Just after daylight on the following day, June 24, 2019, the victim's body was found covered in sheetrock and debris in a ravine where the body had been dragged. Christopher Tape, accepted as an expert in Forensic Pathology, examined the victim's body on June 25, 2019, and determined that the cause of the victim's death was a gunshot wound to his head.

During the investigation, it was learned that Mr. Tennessee drove to New Orleans in the victim's vehicle to sell it. It was there that he was eventually apprehended by police. During the investigation Mr. Tennessee did not confess to killing the victim but admitted to throwing the victim's cell phone out of the vehicle. Detective Chris Groh of the Concordia Parish Sheriff's Office ("Detective Groh") learned that Mr. Tennessee and Defendant had asked the victim for a ride.

As the police investigated this case, officers learned that Defendant may have been in contact with Mr. Tennessee through Facebook. Defendant was picked up by law enforcement approximately a day after the victim's body was found.

During his interview, Defendant, after having been read his *Miranda* warnings, initially denied any involvement in the victim's death. Eventually, however, Defendant confessed that he pointed a gun at the back of the victim's head and shot him. Defendant told police that he and Mr. Tennessee were robbing the victim. Defendant also told police that he was the one who dragged the victim's body down into the ravine and covered him with debris and trash. Defendant then walked away and Mr. Tennessee drove off in the victim's vehicle. Defendant's bloody shoes were found at his residence.

Detective Groh recovered a Glock .40 caliber semi-automatic pistol from Roosevelt Holmes, Defendant's brother-in-law. The pistol was identified by Defendant as being the weapon he used to kill the victim. Nevertheless, Mike Stelly of the North Louisiana Crime Lab, testified that he could not say whether or not the particular Glock recovered in this case fired the projectile that was given to him for testing.

On August 2, 2019, Defendant was charged by grand jury indictment with first degree murder, a violation of La.R.S. 14:30.[1] On November 10, 2020, after a three-day jury trial, a unanimous jury found Defendant guilty as charged. Defendant filed a motion for new trial which was denied on November 23, 2020. After waiving the sentencing delay, Defendant was sentenced that same date to life at hard labor without the benefit of parole, probation, or suspension of sentence. On December 7, 2020, Defendant filed a motion for appeal, which was granted on December 14, 2020.

---

[1] A co-defendant, Mr. Tennessee, was charged by separate grand jury indictment with the first degree murder of the same victim.

## ASSIGNMENTS OF ERROR

In accordance with La.Code Crim.P. art. 844, Defendant has filed four assignments of error,[2] as follows:

1. Defendant's right to confront and cross-examine witnesses against him was violated when the jury was advised of the contents of our-of-court statements made by a co-defendant and another who was charged with accessory after the fact in this case.

2. The trial court erred in admitting inadmissible hearsay evidence of Mr. Riley's plea of guilty to accessory after the fact in Jimmy Lewis' trial.

3. Due to irregularities in the process of the return of the verdict and polling of the jury and the possibility of alternate juror's presence in the jury room during deliberations, Defendant is entitled to an evidentiary hearing on remand to determine if alternate jurors were present and participated in deliberations, and whether a new trial is warranted as a result.

4. Should this honorable court find review of assigned errors No. 1, 2 or 3 precluded due to lack of objection by defense counsel or insufficient basis provided for the objection, Defendant was denied effective assistance of counsel in connection therewith, and review should be granted on that basis.[3]

## ERRORS PATENT

Pursuant to La.Code Crim.P. art. 920, we have reviewed the record for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENTS OF ERROR NO. 1 and NO. 4

Defendant asserts his right to confront and cross-examine witnesses against him was violated when the jury was advised of the contents of out-of-court statements made by Mr. Tennessee, who was charged with the first degree murder

---

[2] Defendant does not contest the sufficiency of the evidence or his sentence.

[3] Although appellate counsel has urged a separate assignment of error, contending Defendant was denied effective assistance of counsel, we will address this assertion as it applies to each individual assignment of error.

4

of the victim in a separate indictment, and by Mr. Holmes, who was in possession of the gun allegedly used in the victim's murder.

*Failure to Preserve Issue*

Before discussing the merits of Defendant's argument, we must determine whether defense counsel failed to preserve this argument for appeal. Louisiana Code of Criminal Procedure Article 841 provides, in pertinent part, "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."

The State moved to enter the out-of-court statement of Mr. Holmes which was taken during the testimony of Detective Groh.[4] Detective Groh was testifying about a portion of Defendant's second statement on July 22, 2019, when he confronted Defendant with the weapon Defendant had admitted that he used to kill the victim. In providing background, Detective Groh stated that the police had recovered the gun under a mattress in the residence of Mr. Holmes. He stated that the location of the gun came through information received from a confidential informant and a conversation he had with Mr. Holmes.

When Mr. Holmes's interview was introduced, defense counsel stated that he had no objection to the video being introduced for the purpose of proving that Mr. Holmes was interviewed but also stated that he did not acquiesce in the accuracy of the content of the interview. In response, the State said, "The State has no intentions of playing the statement . . . I think it's redundant . . . if Mr. Groh confronted [Defendant] or the video about things that Mr. Roosevelt Holmes had given to the –

---

[4] At the trial, Detective Groh was called Warden Groh. For ease of reference, we have chosen to refer to him as Detective Groh.

5

the deputies. I think playing the tape is just lagniappe[,] and I don't want to waste the Jury's time."

Detective Groh then testified about having taken a recorded statement of Mr. Tennessee at the Sheriff's Department in Jefferson Parish. When the State moved to introduce Mr. Tennessee's video interview, defense counsel asserted the same "stipulation." The State asserted that it did not intend to play Mr. Tennessee's interview at that time and would play it only if it became relevant and informed the trial court that it would "be *Crawford* if used."[5] The trial court noted defense counsel's stipulation and allowed the statement to be entered into evidence.

Although the State mentioned the possibility that the introduction of Mr. Tennessee's statement would violate *Crawford*, defense counsel made no mention of *Crawford* or the confrontation clause. Defense counsel simply stated that he did not acquiesce in the accuracy of the statements. Additionally, appellate counsel acknowledges that "[d]espite the initial broad objection, trial counsel failed to raise further objections to the State's presentation of the contents of the statements through other witnesses' hearsay accounts." Nonetheless, appellate counsel "asserts that the initial objection should be sufficient to preserve the constitutional Confrontation Clause issue." Appellate counsel cites *State v. Batiste*, 17-1099, p. 8 (La.App. 3 Cir. 5/9/18), 246 So.3d 52, 58 (alterations in original), a previous opinion wherein this court stated:

> In assignment of error number two, appellate counsel raises an ineffective assistance of counsel claim in the event this court finds the defendant's initial objection to Officer Bowens's testimony regarding Mr. Thomas's statement was not sufficient to preserve the objection to Mr. Thomas's written statement. As noted earlier, defense counsel stated he had no objection to the state's introduction of the written

---

[5] We assume the State was referring to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), which held that the Sixth Amendment to the United States Constitution entitles a defendant to confront witnesses who bear testimony against him.

6

statement. When defense counsel initially asserted the "confrontation clause" objection, it was in response to the state's declaration that Mr. Thomas's unavailability allowed it "to have his record put in, and . . . publish[ed] . . . to the jury." Officer Bowens then proceeded to testify as to the substance of Mr. Thomas's statement. Since defense counsel made his objection known to the trial court prior to Officer Bowens's testimony regarding Mr. Thomas's statement, defense counsel's lack of objection to the introduction of the written statement does not impede review of this assignment of error. Further, when there is an issue regarding the possibility of the violation of a basic constitutional right, failure to object does not preclude appellate review. Accordingly, there is no need to address defense counsel's ineffective assistance of counsel claim.

After reviewing *Batiste*, we find it factually distinguishable from the present case. Unlike counsel in *Batiste*, defense counsel in the present case did not base even his initial broad objection on the confrontation clause. Thus, we find Defendant failed to preserve his claim that the introduction of statements by Mr. Holmes and Mr. Tennessee violated his right to confront his accusers. La.Code Crim.P. art. 841.

*Failure to object—ineffective assistance of counsel*

Appellate counsel asserts in assignment of error number four that trial counsel was ineffective for failing to preserve this error for appellate review.

Claims of ineffective assistance are analyzed as follows:

> Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. *State v. Prudholm*, 446 So.2d 729 (La.1984); *State v. Johnson*, 557 So.2d 1030 (La.App. 4 Cir.1990); *State v. Reed*, 483 So.2d 1278 (La.App. 4 Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. *State v. Seiss*, 428 So.2d 444 (La.1983); *State v. Ratcliff*, 416 So.2d 528 (La.1982); *State v. Garland*, 482 So.2d 133 (La.App. 4 Cir.1986); *State v. Landry*, 499 So.2d 1320 (La.App. 4 Cir.1986).

> The defendant's claim of ineffective assistance of counsel is to be assessed by the two part test of *Strickland*

7

> *v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d
> 674 (1984); *State v. Fuller*, 454 So.2d 119 (La.1984). The
> defendant must show that counsel's performance was
> deficient and that he was prejudiced by the deficiency.
> Counsel's performance is ineffective when it can be
> shown that he made errors so serious that counsel was not
> functioning as the "counsel" guaranteed to the defendant
> by the Sixth Amendment. *Strickland*, *supra*, 466 U.S. at
> 686, 104 S.Ct. at 2064. Counsel's deficient performance
> will have prejudiced the defendant if he shows that the
> errors were so serious as to deprive him of a fair trial. To
> carry his burden, the defendant "must show that there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would
> have been different. A reasonable probability is a
> probability sufficient to undermine confidence in the
> outcome." *Strickland*, *supra*, 466 U.S. at 693, 104 S.Ct.
> at 2068. The defendant must make both showings to prove
> that counsel was so ineffective as to require reversal. *State
> v. Sparrow*, 612 So.2d 191, 199 (La.App. 4 Cir.1992).
>
> This Court has recognized that if an alleged error
> falls "within the ambit of trial strategy" it does not
> "establish ineffective assistance of counsel." *State v.
> Bienemy*, 483 So.2d 1105 (La.App. 4 Cir.1986).
> Moreover, as "opinions may differ on the advisability of a
> tactic, hindsight is not the proper perspective for judging
> the competence of counsel's trial decisions. Neither may
> an attorney's level of representation be determined by
> whether a particular strategy is successful." *State v.
> Brooks*, 505 So.2d 714, 724 (La.1987).

*State v. Griffin*, 02-1703, pp. 8-10 (La.App. 4 Cir. 1/15/03), 838 So.2d
34, 40, *writ denied*, 03-809 (La. 11/7/03), 857 So.2d 515.

*State v. Meaux*, 21-522, pp. 9-10 (La.App. 3 Cir. 2/23/22), 335 So.3d 309, 315-16.

Whether we address appellate counsel's arguments as an error properly preserved for review or as an ineffective assistance of counsel claim, our first task is to determine whether an error occurred. Accordingly, we will first analyze whether the introduction of the statements of Mr. Tennessee and Mr. Holmes violated Defendant's constitutional right to confront his accusers.

*Statement of Sedrick Tennessee*

Defendant first attacks the introduction of statements made by Mr. Tennessee, a co-defendant who was interviewed and charged with the first degree murder of the victim. Although Mr. Tennessee's interview was not played for the jury, Defendant complains that the State's repeated references to Mr. Tennessee's statements violated Defendant's confrontation rights. Because trial counsel did not object to any specific statements made during the trial, we will discuss those that may have influenced the jury.

Detective Groh testified that because of statements given by Defendant and Mr. Tennessee, the police knew the blood in the vehicle belonged to the victim. According to Mr. Tennessee, Defendant asked the victim to stop the vehicle so that he could use the restroom. According to Detective Groh, not only did Mr. Tennessee say Defendant shot the victim in the vehicle, but Defendant also admitted that in his statement to the police. Lieutenant Phillip Smith, who assisted in the crime investigation, testified that Mr. Tennessee said he was splattered by the victim's blood when Defendant shot the victim.

Detective Groh also testified as to Facebook messages Mr. Tennessee sent to Defendant. The following Facebook message was read to the jury:

> "Bitch, you throwing the wrong charge on me. I got a life, bitch. You been a bum. You is stupid so get your stupid ass up there and go fuck them punk - - punks, bitch. I'm not taking your charge, bitch. You ain't Duke Tago Terrio (phonetic) or Mike, bitch. I die behind Tennessee boys, bitch. Get up there before I kill you, bitch, and that's on Sonya, bitch. Yeah, you did and I thought you was gonna shot (sic) me because you ain't no killing. You went in a shook (sic) and the boy was dead and your black stupid ass in the backseat and the truck about to go in the bar. You want to shot (sic) me and I left you and the body, bitch. I got two leg, hell, yeah. Bitch, bye."

Another message read:

9

"Bitch, if I'ma going in, bitch, I'm going for something the whole Ferriday. No, you ain't no gangsta. You just do dumb shit. It's up there. Fuck you pussy, yeah, you did it. You say you a gangsta so get up there onester - - wanster. I be (sic) my murder charge. I be (sic) my murder charge in 2005, bitch, and I hope you get the electric chair. You need it. Don't never let me see you. I told you what happened. I was getting the fuck to New York. You dumb (sic) it too. If it wasn't for you stealing out that truck my name would be clear, bitch. You a hoe boy. I hope you die today and your kids."

Finally, the following message was read:

"Jimmy Lewis, you better be a man, bitch. You claim you a gangsta, bitch, that's on you, bitch. You kill that nigga, bitch, when you could have used your hand, bitch, on my dead sista. Before I go for nothing I will kill you, bitch. Take your lick. Clear my name bitch. Hell yeah, I left your crazy dumb. I got my kids to live for. You doing nothing with your life. Fuck you and nope, bitch, that's what you get for stealing Jimmy Lewis. If you don't turn yourself in like a man, bitch, by the night I'ma slide on you bitch. You dumb. You living for nothing and I'm a renter, bitch and not you little stealing bitch I hope you die before I see you. Now I'ma real gangsta because if I would of did that, it would not be no evidence. You bitch. I'm not taking your - - talking your lick. Fuck you. Die a slow Mister - - Miss Jimmy Lee over track you trying' jackin' that old lady and she shop (sic) yo ass in the head with a axe bitch. Get up before I see bitch. I'm dyin' behind my bitch. Clear this business - - the business and I'ma bout to call the police on your dumb killing ass. You should have shot yourself bitch. I'ma."

Detective Groh testified that although Defendant told him about the robbery, Mr. Tennessee said he did not know anything about a robbery. Appellate counsel specifically notes the following colloquy between the State and Detective Groh:

Q.     Mr. Lewis told you that no one was supposed to get hurt? No one was supposed to get hurt in the robbery?

A.     Correct.

Q.     So you knew this was a robbery?

A.     Correct.

Q.     By what Mr. Lewis told you?

A.     Correct.

Q.     Mr. Tennessee told you differently, correct?

10

A.      Correct.

Q.      Mr. Tennessee said he didn't know anything about a robbery, this all happened when he was just an innocent bystander in the front seat?

A.      Correct.

Q.      Who told you about the robbery?

A.      Jimmy Lewis.

Q.      Jimmy Lewis told you.

A.      Correct.

According to Defendant's own statement, it was after the victim's body was dumped and covered with debris that he left.  Detective Groh testified that Mr. Tennessee said he threw the victim's cell phone out of the vehicle and then went to the Holiday Apartments and contacted Mr. Riley.  Finally, defense counsel notes in her brief that a picture of Mr. Tennessee was published to the jury because the State wanted them to see the person they had been talking about.

Appellate counsel concludes her argument regarding Mr. Tennessee's statements as follows:

> Mr. Tennessee's unsworn, out-of-court statement deprived the defendant of his right to confront his accuser and thus created a questionable unchallenged narrative for the jury to consider.  Not only was the statement given to the jury without any right of cross-examination, but the statement was a self-serving exculpatory statement of questionable veracity given the circumstances of Tennessee's own involvement.  Such incomplete, unassailable testimony blocked Appellant's possible defense that the killing was not first degree murder, but second degree murder, or manslaughter, a killing committed in sudden passion or heat of blood.  The error in admitting the out-of-court statement and allowing significant portions of its contents to be provided to the jury was not harmless beyond a reasonable doubt.

*Statement of Roosevelt Holmes*

As with Mr. Tennesee's interview, Mr. Holmes's video interview was introduced but not played for the jury. The State entered the interview into evidence to show that the police took the time to interview Mr. Holmes and to show that the police recovered the gun. According to Detective Groh, Mr. Holmes made some admissions about having the gun in his possession under his mattress. Appellate counsel makes no mention of any other statements made by Mr. Holmes. Appellate counsel argues as follows:

> Ballistics did not establish the projectile recovered was fired from the Glock recovered from Roosevelt Holmes. The introduction of the Glock was allowed over defense objection, despite the lack of ballistics confirming it was the weapon used in this case.
>
> While Mr. Lewis said the Glock shown to him by detectives was the one used, there were no special markings on the gun, and there is no indication Mr. Lewis checked the serial number. The State's reference to Mr. Holmes' out-of-court statement allowed the State to introduce the weapon without ballistics evidence and deprived Mr. Lewis of the right to test Roosevelt Holmes' claims regarding the gun.

*Jurisprudence*

In *State v. Savoy*, 11-1041, pp. 6-7 (La.App. 3 Cir. 4/4/12) (unpublished opinion), *writ denied*, 12-915 (La. 10/26/12), 99 So.3d 639, this court stated the following when analyzing this issue:

> The defendant argues, in the one assignment of error filed by his counsel, that the trial court erred when it allowed the admission of the victim's two out-of-court statements because they were inadmissible hearsay; and that he was deprived of his Sixth Amendment right to confront and cross-examine his accuser.
>
> > The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This right is secured for defendants in state as well as federal criminal proceedings. *See Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923, 928 (1965). The confrontation clause of our state constitution specifically and expressly guarantees each accused the right "to confront and cross-examine the

12

witnesses against him." *See* La. Const. art. 1, § 16, titled "Right to a Fair Trial."

> Confrontation means more than being allowed to confront the witnesses physically. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 J. WIGMORE, EVIDENCE § 1395, p. 123 (3d ed.1940)). Cross-examination is the principal means by which believability and truthfulness of testimony are tested. Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness. *See Davis v. Alaska,* 415 U.S. at 316, 94 S.Ct. at 1110; *State ex rel. Nicholas v. State,* 520 So.2d 377, 380 (La.1988); *State v. Hillard,* 398 So.2d 1057, 1059–1060 (La.1981).

*State v. Robinson*, 01-273, pp. 5-6 (La.5/17/02), 817 So.2d 1131, 1135 (footnote omitted).

> . . . .

In response, the defendant relies on the holding in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), which bars admission of all out-of-court testimonial statements unless the witness who made the statement was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness.

Because the State in *Savoy* failed to prove the unavailability of the witness, we discussed whether the excited utterance exception provided in La.Code Evid. art. 803 was applicable. After finding the statement was an excited utterance, the court nonetheless found the defendant's confrontation rights were violated because the statement was "testimonial" in nature and was admitted without an opportunity for the defendant to cross-examine the witness:

> We do find, however, that the first written statement, given to the police within fifteen minutes after the defendant escaped into the swamp, was an excited utterance and, therefore, an exception to the hearsay rule. However, the inquiry does not end there. The statement

made at the bridge was testimonial in nature, and the facts given in the statement were offered into evidence to prove the truth of the matter asserted. According to the rationale of the United States Supreme Court in *Crawford*, the statement is still not admissible unless the defendant had a prior opportunity to cross-examine the victim before the testimonial statement was introduced into evidence. The state asserts that the defendant's failure to cross-examine the victim at trial satisfies that requirement. We disagree.

In *State v. Williams*, 04-608 (La.App. 5 Cir. 11/30/04), 889 So.2d 1093, *writ denied*, 05-81 (La.4/22/05), 899 So.2d 559, the fifth circuit found that the defendant was denied his Sixth Amendment right to confront his co-defendant, who had made an out-of-court statement that the defendant was the one who killed the victim, then refused to testify at trial. The fifth circuit discussed whether the trial court erred when it admitted the co-defendant's statement into evidence, as follows:

> In this case, as previously noted, Arvel Gurganus refused to be sworn in and asserted his Fifth Amendment privilege against self-incrimination. The trial court then ruled that Gurganus was unavailable. After Gurganus was given testimonial immunity, he provided unresponsive answers to the prosecutor, when asked questions about his police statement. In his police statement, Gurganus admitted stealing a van on the morning November 25, 2000. It appears that Gurganus' statement qualifies under the declaration against penal interest exception to the hearsay rule making the statement admissible. In his statement, Gurganus incriminates himself in the additional crime of stealing a van, thereby subjecting himself to additional criminal charges, which gives reliability to his statement.

> In *Crawford v. Washington* however, which was rendered after the present case was tried and decided, the United States Supreme Court found that certain ex parte examinations, while admissible under modern hearsay rules, are exactly the kind of testimonial evidence against the accused that the confrontation clause is supposed to prevent: that is, testimonial evidence in the form of an out-of-court declaration to establish or prove a fact. The Supreme Court found that under the Sixth Amendment a necessary condition for the admissibility of the testimonial statements against an accused in a criminal case is the prior opportunity to confront the unavailable witness. The Court noted that statements taken by police in the course of interrogations are testimonial hearsay for purposes of the Sixth Amendment, and that these statements present a unique opportunity for prosecutorial abuse. Therefore, in

14

> light of *Crawford v. Washington,* in order for Gurganus'' police statement to be admissible in the present case, the State had to show that Gurganus was unavailable and that there was a prior opportunity to confront the witness.
>
> . . . .

*Id.* at 1100-02 (footnotes omitted).

> Like *Williams,* the record in the current case does not reflect that there was an opportunity to cross-examine the witness at the time she made the statement or any time subsequent. The victim refused to testify regarding her statement at trial, and it was very unlikely that she was going to answer the defendant's questions either. It was error for the trial court to allow the admission of the victim's written statement, even though it was an excited utterance or present sense impression, because the statement was testimonial in nature and the defendant had no prior opportunity to confront the victim.

*Id.* at pp. 17-19.

Because defense counsel in the present case did not specifically assert a violation of Defendant's confrontation rights in his objections, there was no discussion about the unavailability of Mr. Tennessee and Mr. Holmes. Moreover, there was no discussion either about the lack of Defendant's opportunity to cross-examine Mr. Tennessee and Mr. Holmes or about whether their statements were testimonial in nature. Assuming Mr. Tennessee and Mr. Holmes were unavailable and assuming defense counsel did not have the opportunity to cross-examine them at a previous hearing, we find that the next question we must examine is whether the statements of Mr. Tennessee and Mr. Holmes were testimonial in nature.

In *State v. Falkins*, 12-1654, pp. 11-13 (La.App. 4 Cir. 7/23/14), 146 So.3d 838, 847-48, the fourth circuit addressed the issue of whether a statement was testimonial:

> The defendant first argues that the 911 calls should have been suppressed because the substance of the calls was testimonial in nature, and therefore violated his rights under the Confrontation Clause of the Sixth Amendment, which guarantees the right of a criminal defendant

15

"to be confronted with the witnesses against him." The United States Supreme Court has held that this guarantee, which is extended to the States by the Fourteenth Amendment, includes the right to cross-examine witnesses. *Cruz v. New York*, 481 U.S. 186, 189, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); *State v. Collins*, 10-0757, p. 22 (La.App. 4 Cir. 5/11/11), 65 So.3d 271, 286.

In support of this argument, the defendant relies on United States Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), wherein the Court held that the admission of a recorded statement given to police by the defendant's wife violated the defendant's right under the Confrontation Clause because the statement was hearsay, because it was testimonial in nature, and because his wife did not testify at trial due to the state's marital privilege. Most significantly, because his wife did not testify at trial, the defendant had no other opportunity to cross examine her. The Court specifically declined to define the term, "testimonial," stating only that "[w]hatever else the term covers, it implies at minimum to . . . police interrogation." *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374.

The Supreme Court later elaborated on the meaning of testimonial statements in connection with the Sixth Amendment's Confrontation Clause in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)—a case dealing specifically with the admission of statements made during a 911 call. In *Davis*, the victim called 911 to report a domestic altercation with her ex-boyfriend. *Id.*, 547 U.S. at 817, 126 S.Ct. at 2270-71. During the call, the victim identified the defendant as her attacker and described the specifics of the ongoing assault in response to questions by the 911 operator. *Id.,* 547 U.S. at 817-18, 126 S.Ct. at 2271. The trial court allowed the recording of the 911 call to be admitted into evidence despite the fact that the victim did not testify at trial. *Id.*, 547 U.S. at 822, 126 S.Ct. at 2273-74. In finding the recordings to be nontestimonial in nature, and therefore admissible, the Supreme Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.*

The Court reasoned that the statements were nontestimonial because "[a] 911 call, . . . at least the initial interrogation conducted in

connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Davis*, 547 U.S. at 826, 126 S.Ct. at 2276. The Court noted that the victim was "speaking about events as they were actually happening, rather than 'describ[ing] past events'" and that, "[a]lthough one might call 911 to provide a narrative report of a crime absent any imminent danger, [the victim's] call was plainly a call for help against bona fide physical threat. *Id.*, 547 U.S. at 827, 126 S.Ct. at 2276. The Court also reasoned that the nature of the questions posed by the 911 operator indicated that the purpose of the interrogation was to "resolve the present emergency, rather than simply to learn . . . what had happened in the past." *Id.* Finally, the Court reasoned that the fact that the victim's answers were frantic and provided over the phone, in an environment that was not tranquil, or even . . . safe" indicated that the statements were nontestimonial. *Id.*, 547 U.S. at 827, 126 S.Ct. at 2276-77. *See also, Michigan v. Bryant*, ___ U.S. ___, 131 S.Ct. 1143, 1157, 179 L.Ed.2d 93 (2011).

*State's Argument*

The State argues that the interviews of Mr. Tennessee and Mr. Holmes were not presented to the jury and were offered to explain the sequence of events in the investigation, not for the truth of anything alleged in the statements. The State contends the interview of Mr. Holmes provided the basis for the investigators to question Defendant about the gun in his second statement, "where he identified the gun as the one he used to shoot and kill Mr. McCray and later disposing of it." As for Mr. Tennessee's statements, the State asserts:

> The interview with Mr. Tennessee helped form the basis for the investigators' decision that DNA testing of the blood found in the car was unnecessary. To prove the facts of the case, the state introduced Defendant's June 24, 2019, statement, wherein he confessed to shooting and killing Fred McCray, Jr., in the course of a robbery, and his July 22, 2019, statement, where he identified the gun he used to kill Fred McCray, Jr., and admitted to disposing of it – a fact he had initially lied about in his first statement.

> Clearly the evidence admitted was not testimonial statements subject to *Crawford* exclusion. The jury never even saw or heard the statements of Mr. Holmes or Mr. Tennessee. The references to those statements in the officers' testimonies were merely to explain the sequence of events in the investigation and the steps taken by the investigators. At no point did the State present any portion of the

17

statements to the Jury to prove the truth of the facts alleged in those statements. To prove those facts, the State introduced the statements of the Defendant himself, where he repeatedly admitted to shooting and killing Mr. McCray.

*Analysis*

From our examination of the record, we find that neither of the statements made in the present case were made to resolve an emergency. Rather, we find that the statements were made after the police determined that they were dealing with a homicide rather than a missing person. The officers' questions were posed to learn what happened in the past rather than to resolve a current emergency. Despite the brevity of the State's reference to Mr. Holmes's statement, it still constituted a statement by Mr. Holmes that the gun was located underneath his mattress. Thus, we find the statements made by Mr. Holmes and Mr. Tennessee were testimonial in nature.

As appellate counsel acknowledges, a harmless error analysis is appropriate when evidence is introduced at trial in violation of Defendant's confrontation rights.

Despite finding that the trial court erred when it allowed the admission of the two statements into the record, we find the errors to be harmless.

An error in the defendant's right to confrontation is subject to a harmless error analysis. If a confrontation error occurred, a reviewing court must determine whether the error is harmless beyond a reasonable doubt. In determining whether the guilty verdict rendered was unattributable to the error the following factors should be considered: 1) whether the witness' testimony was important; 2) whether the testimony was cumulative in nature; 3) whether corroborating or contradictory evidence regarding the major points of the testimony existed; 4) the extent of cross-examination permitted; and 5) the overall strength of the State's case.

*Id.* at 1102 (footnotes omitted).

*Savoy*, 11-1041, p. 20 (quoting *Williams*, 889 So.2d at 1102).

18

The supreme court has stated the following regarding the harmless error analysis:

> Writ granted in part. Defendant was found guilty of manslaughter in response to the charge of second degree murder, and sentenced to 20 years imprisonment at hard labor. The court of appeal affirmed. *State v. Eaglin*, 17-657 (La.App. 3 Cir. 3/28/18), 239 So.3d 1001. In affirming, a majority of the panel found the error in admitting a highly inflammatory photograph of defendant, which lacked any probative value, was harmless because the State introduced *sufficient evidence* to support the conviction. *See Eaglin*, 17-657, p. 40, 239 So.3d at 1027 ("There was consistent testimony regarding the fight that preceded the shooting that was sufficient to convict the defendant of manslaughter. The trial court's error in admitting the prejudicial photograph, Exhibit S-2, is, therefore harmless."). Judge Cooks, dissenting, noted that the majority applied the wrong standard in determining whether the error was harmless. The dissent is correct in that assessment. Under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), an appellate court must decide "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," and "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Id.*, 386 U.S. at 24, 87 S.Ct. at 828. In applying the *Chapman* standard, "[t]he question, however, is not whether the legally admitted evidence was sufficient . . . , which we assume it was, but rather, whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *See Satterwhite v. Texas*, 486 U.S. 249, 258-259, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) (quoting *Chapman*). Because the court of appeal applied the wrong standard, we grant in part and remand to the court of appeal to determine whether the State has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. The application is otherwise denied.

*State v. Eaglin*, 18-822, pp. 1-2 (La. 3/18/19), 265 So.3d 761, 761-62 (alterations in original).

Similarly, to prove ineffective assistance of counsel, Defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068 (1984). Considering these standards, we will

examine whether there is a reasonable possibility that the admission of the statements of Mr. Holmes and Mr. Tennessee contributed to the conviction.

Appellate counsel argues the uncontested testimonies of Mr. Holmes and Mr. Tennessee blocked Defendant's possible defense that the killing was not first degree murder but second degree murder or manslaughter.

First degree murder is defined in La.R.S. 14:30 and provides, in pertinent part:

> A. First degree murder is the killing of a human being:
>
> (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated or first degree rape, forcible or second degree rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

Although the grand jury indictment does not specify in which of the above enumerated felonies Defendant was engaged when he specifically intended to kill or inflict great bodily harm upon the victim, the trial court instructed the jury that the enumerated felonies were armed robbery, second-degree robbery, or simple robbery. Armed robbery is defined in La.R.S. 14:64, in pertinent part, as follows:

> A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

During closing argument, defense counsel asserted that even though it was not disputed that Defendant shot the victim, there was no robbery plan, no robbery took place, and the killing was not intentional. Defense counsel noted that Defendant left without taking any money. As reflected in the record, defense counsel argued:

> [I]t's the prosecution's case that [the victim] died because of a - - of a robbery. That there was a plot put together to rob Mr. McCray, and it

20

was - - who put the plot together was Mr. Lewis and Mr. Tennessee.  It was their burden to prove that.  But we go back and look at the statements given.  Mr. Lewis basically said that he came up to give him a ride after Mr. Tennessee had already stopped him, Mr. McCray, and asked him for a ride, then he came up and asked for a ride also.  He also, if you look [at] Mr. McCray's - - I'm sorry, Mr. Tennessee's statement, it corroborates that fact.  That he stopped Mr. McCray and then Mr. Tennessee - - I get these names confused - - Mr. Lewis ran up and asked could he ride also.  And after getting verification from Mr. Tennessee, Mr. McCray agreed to let them both get a ride.  If that's the case, then there was no time to plot a robbery.  There was no discussion of a robbery in the car with Mr. McCray because he would have heard that himself.  So, there was no robbery plan here to begin with.  Then we see - - Mr. Lewis tells you that while driving, they're heading to Clayton, he tells Mr. Lewis - - excuse me, Mr. McCray that he had to stop and use the restroom.  So, Mr. McCray pulls over, let's [sic] him get out and Jimmy gets out of the car to go take care of his business.  And when he get's [sic] back in, there's an incident involved and Mr. McCray's wound up shooting - - being shot.  And, unfortunately, my client was the one holding the gun, which he's not - - he's never denied that.

What we have here is that there was an altercation between Mr. McCray and Mr. Tennessee.  You've seen there where he says, "I held the gun up," which is not denied.  We never denied that.  "I held the gun up.  I pointed it at him.  I pointed at basically both - - basically both of them and told them to chill out."  That is undisputed.  He told him to chill out.  And after that, the gun goes off.  Unfortunately, Mr. McCray's struck with - - in the head and he dies.  That's what this case is all about.  Did he intentionally kill him?  No.  Was there - - was there a robbery going on in the car on behalf of Mr. Lewis?  No.  Mr. Lewis told you himself, he said, "I didn't need the money.  I had money in my pocket.  So, I didn't need to rob him."  Did he take anything from the robbery - - from this incident?  No.  In fact, after the robbery was - - after the - - Mr. McCray's body was - - dumped, my client walked away, didn't even ride in the car again.  He just walked away.  Didn't take any money.  Didn't take any credit card.  Didn't take any jewelry.  Didn't take anything whatsoever.  What was taken in this case, was taken by Mr. Tennessee.  The car was taken by Mr. Tennessee.  The credit card was taken by Mr. Tennessee.  They eventually wound up in the hands of Mr. Riley[.]

Despite defense counsel's argument, we find that there was evidence besides

Mr. Tennessee's statement that Defendant intended to rob the victim.  According to

Detective Groh, Defendant told him that he and Mr. Tennessee were robbing the

victim. Later in his testimony, Detective Groh again testified that Defendant is the one who told him that Defendant and Mr. Tennessee were robbing the victim.

Defendant's video interview was shown to the jury and reviewed by this court. Although it is difficult to understand Defendant in the interview, Defendant clearly admitted to shooting the victim. He actually used the detective's head to illustrate how he shot the victim. Defendant also admitted that both he and Mr. Tennessee told the victim to give them his money. When Detective Groh asked Defendant if he and Mr. Tennessee talked about "getting a lick off the victim," Defendant replied "No, not really." Defendant also said that he was not the one who needed money because he had enough money in his pocket. Finally, in the interview, Defendant said no one was supposed to get hurt.

In his second interview, Defendant explained that earlier on the day of the shooting, Terrell Harbor ("Mr. Harbor") gave him the gun used in the shooting. Defendant said that Mr. Harbor asked Defendant to hold it for Mr. Holmes. When Detective Groh asked Defendant if Mr. Tennessee ever said, "we fixing to rob this guy," Defendant replied, "No." Detective Groh asked Defendant what caused the fight between the victim and Mr. Tennessee, and Defendant guessed Mr. Tennessee was trying to take something from the victim. Defendant explained that when he got out of the car to urinate, he saw Mr. Tennessee and the victim messing around in the car. Defendant said he drew his gun and said "man chill out, man chill out."

Considering the above, we find any error in the admission of the statements of Mr. Tennessee and Mr. Holmes was harmless beyond a reasonable doubt. Since Defendant admitted to shooting the victim and positively identified the gun he used, there is no reasonable possibility that any statement by Mr. Holmes regarding the gun contributed to the jury's verdict. As for the murder occurring during an armed

22

robbery, Defendant admitted during his interview with Detective Groh that he and Mr. Tennessee both told the victim to give them his money. Defendant expressed remorse and said no one was supposed to get hurt. Defendant told Detective Groh to tell the family this was not supposed to happen. Considering the entirety of the record, we find it was reasonable for the jury to believe from Defendant's statement that Defendant initially intended to just rob the victim but ended up shooting the victim when the victim resisted. Therefore, we find that any error that occurred in the admission of these statements was harmless beyond a reasonable doubt.

For the foregoing reasons, we conclude this assignment of error lacks merit.

### ASSIGNMENTS OF ERROR NO. 2 and NO. 4

Defendant next asserts the trial court erred in admitting inadmissible hearsay evidence of Mr. Riley's plea of guilty to accessory after the fact for the murder of the victim.

During its examination of Mr. Riley, the State asked if he remembered being in the courtroom on September 30th of the same year. When Mr. Riley said he could not remember, the following colloquy took place:

Q. That's why I have documents to remind you.

A. I know.

Q. I want to show you what I've marked as State's 221. Do you know what that is?

A. (Unintelligible – reading document.)

Q. Do you know what that is?

A. No.

Q. You don't know what that is?

A. No, sir.

23

Q.     Those are certified minutes where you pled guilty in this courtroom to the accessory after the fact to a first-degree murder. You're [sic] name's Ronald Riley, correct?

A.     Yes, sir.

Q.     Is that your attorney, sitting beside - - behind Mr. Boothe?

A.     Yes, sir.

Q.     Mr. Pardue?  His name's in there and you stood up and pled guilty to the accessory after the fact to a - - excuse me, to a first-degree murder.

A.     Okay.

Q.     You remember doing that?

A.     September, October.

Q.     September 30, 2020.

A.     Yes, sir.

Q.     You remember doing that?

A.     Yes, sir, because he told - - that's - -

Q.     I'm not asking what - - I'm not going to ask you what your attorney told you, that's between you and your attorney.  I'm asking you whether or not you pled guilty to accessory after the fact.

A.     Yes, sir.

The State then introduced a minute entry indicating Mr. Riley pled guilty to accessory after the fact on September 30, 2020, and was sentenced to five years of hard labor, with one year suspended, on March 21, 2021.  Defense counsel stated he had no objection to the introduction of the evidence.

*Failure to Preserve Review*

As we noted earlier, La.Code Crim.P. art. 841 states that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."  However, Defendant again asserts that trial counsel's failure to object

to the introduction of Mr. Riley's guilty plea constituted ineffective assistance of counsel. Accordingly, we will further address this issue.

*Defendant's Argument in Brief*

Defendant argues that although it was proper for Mr. Riley to testify regarding the facts giving rise to his guilty plea, the introduction of the plea is prohibited by La.Code Evid. arts. 802 and 803.

Louisiana Code of Evidence Article 802 states, "Hearsay is not admissible except as otherwise provided by this Code or other legislation." Thereafter, La.Code Evid. art. 803 delineates certain exceptions to the prohibition of hearsay. According to appellate counsel, the following is the pertinent portion of La.Code Evid. art. 803:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> **(22) Judgment of previous conviction.** Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of six months, to prove any fact essential to sustain the judgment. This exception does not permit the prosecutor in a criminal prosecution to offer as evidence the judgment of conviction of a person other than the accused, except for the purpose of attacking the credibility of a witness. The pendency of an appeal may be shown but does not affect admissibility.

The 2021 version of the Handbook on Louisiana Evidence Law contains the following authors' note to La.Code Evid. art. 803(22)[6]:

> **(2) Criminal Cases.** This exception to the hearsay rule applies in criminal cases with respect to convictions of the accused and convictions offered by an accused against the prosecution. However, as to convictions of other persons, the admission of convictions by the prosecution in criminal cases is limited to attacking credibility. See

---

[6] Although appellate counsel quotes a different comment to La.Code Evid. Art. 803(22), we have been unable to find the quotation relied upon. Notwithstanding, we note that both comments, though worded differently, make it clear that a conviction of a person other than the accused may be admitted solely to attack the person's credibility.

25

however, *State v. Cotton*, 778 So. 2d 569 (La. 2001), discussed in Authors' Note (10) to Article 801.

Thus, it appears appellate counsel is asserting that the State used Mr. Riley's prior conviction for a purpose other than to attack his credibility. Appellate counsel further argues the admission of Mr. Riley's conviction prejudiced Defendant:

> The C.E. Art. 802-803 hearsay violation abridged Jimmy O'Neal Lewis' right to due process and a fair trial and violated his presumption of innocence since he was on trial for First Degree Murder. The jury likely thought someone – Jimmy O'Neal Lewis – had to be guilty of First Degree Murder if Ronald Riley had already pled guilty to accessory after the fact. A new trial should be ordered.

### *The State's Argument in Brief*

Because trial counsel did not object to the admission of Mr. Riley's conviction, the State did not explain its admission. In its brief on appeal, the State argues:

> The Trial Court did not err in admitting the evidence of Ronald Riley's conviction of Accessory After the Fact. Code of Evidence Article 803(22) allows introduction of a plea of guilty to Accessory After the Fact by the prosecutor to attack the credibility of a witness. That was precisely the purpose for which this evidence was admitted. Mr. Riley's conviction is a negative factor in the Jury's weighing of the credibility of his testimony. The State introduced evidence of that conviction to expose that negative factor to the Jury. By making them aware of Mr. Riley's conviction, the State has given the Jury the basis upon which to question Mr. Riley's credibility.

### *Analysis*

Although not cited by either party, La.Code Evid. art. 609.1 provides, in pertinent part:

> **A. General criminal rule.** In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
>
> **B. Convictions.** Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an

26

arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.

**C. Details of convictions.** Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense[.]

Considering the above and because Mr. Riley testified at trial, the State was allowed to introduce the fact of his guilty plea, the name of the offense to which he pled, the date thereof, and the sentence imposed. The record shows that Mr. Riley initially denied that he told the detective that he saw blood in the vehicle driven by Mr. Tennessee. However, after listening to a segment of his statement to police, Mr. Riley admitted that he told Detective Groh that there was blood in the vehicle. Thus, it is clear Mr. Riley's testimony at trial placed his credibility at issue. Consequently, we find Defendant not only fails to show the trial court erred in admitting evidence of Mr. Riley's guilty plea to accessory after the fact, but he also further fails to show his trial counsel was ineffective for failing to object to the admission of Mr. Riley's guilty plea. Additionally, because of Defendant's confession, there is no reasonable possibility that the admission of Mr. Riley's guilty plea to accessory after the fact contributed to the jury's verdict.

Accordingly, we find this assignment of error lacks merit.

**ASSIGNMENTS OF ERROR NO. 3 and NO. 4**

Defendant alleges that "due to irregularities in the process of the return of the verdict and polling of the jury and the possibility of alternate juror's presence in the jury room during deliberations," he is entitled to an evidentiary hearing to determine whether alternate jurors were present and participated in deliberations. Appellate counsel contends that even though the trial judge instructed the alternate jurors to retire to his chambers while the principal jurors deliberated, it appears from another

27

section of the transcript that the alternate jurors were with the principal jurors prior to the verdict being announced.

*Failure to Preserve Issue*

Once again, the record is void of any objection by trial counsel as to the alternate jurors having participated in deliberations. Thus, we find Defendant is precluded from raising this issue on appeal. La.Code Crim. P. art. 841. Nonetheless, as with the other assignments, appellate counsel further argues that Defendant's trial counsel was ineffective for failing to object to this error. Accordingly, we will address the alleged error.

*State's Argument*

The State contends that no evidentiary hearing is needed because the record is clear that the alternate jurors were not present during any of the deliberations. According to the State, the alternate jurors were sent to the judge's chambers and instructed to keep separate from the principal jurors during deliberations. The State contends in its brief to this court that the count of the polling slips was clearly twelve when the jury was polled.

*Analysis*

Our review of the record shows that at the conclusion of its instructions to the jury, the trial judge thanked the alternate jurors and stated that the law did not permit them to participate in the deliberations. The trial judge then asked the two alternates to adjourn to his chambers and remain sequestered until the jury reached a verdict. When the principal jurors exited the courtroom, the trial judge stated once again that the two alternate jurors were to retire to his chambers until the "first 12" reached a verdict. Subsequently, the following colloquy occurred:

28

**THE COURT:**

Okay, Gentlemen, I would note its 4:36 PM November 10, 2020. Present: Mr. Brad Burget and Mr. Joe - - Joey Boothe, for the State of Louisiana, and Mr. Darrell Hickman, and Jimmy O'Neal Lewis, present. Mr. Bailiff, do we have - - the Jury have a verdict?

**BAILIFF:**

Yes, sir, they have a verdict.

**THE COURT:**

All right. Ready to proceed with the Jury, gentlemen?

**MR. HICKMAN:**

Yes, Your Honor.

**MR. BURGET:**

Yes, sir. I would assume -- Your Honor, before we bring them in, I would assume the Madam Clerk has the polling forms for the Jury or the Judge has the polling forms for the Jury? We have 12 of those?

**THE COURT:**

Uh-huh.

**MR. BURGET:**

We have pens and pencils? And obviously, any verdict's got to be unanimous, 12 out of 12, Your Honor, so we'll need to poll the Jury to see what the - - the - - whether or not we have a valid verdict.

**THE COURT:**

Yes, Mr. Bailiff, if you will, please escort the Jury into the jury room.

**BAILIFF:**

Yes, sir.

**MR. BURGET:**

From the jury room.

**THE COURT:**

From the jury room to the courtroom. Thank you, Mr. Burget.

**MR. BURGET:**

Yes, sir.

**THE COURT:**

Long day.

**MR. BURGET:**

I understand, Your Honor.

### (JURORS ENTER THE COURTROOM)

**THE COURT:**

All Jurors present and accounted for, Mr. Burget?

**MR. BURGET:**

Your Honor, I count 12 Jurors. The State waives polling of the Jury.

**THE COURT:**

Mr. Hickman?

**MR. HICKMAN:**

I count 12, as well, Your Honor.

It is clear from the above colloquy that only twelve jurors returned to the courtroom with the verdict. The colloquy continued as follows:

**THE COURT:**

All right. So noted. You - - Jury, you've selected one person as a foreperson of this Jury, and who is it? Okay. If you have a Jury - - a verdict form, if you will, please hand it to the Bailiff for me, please. Gentlemen, may you approach? You may be seated. Everybody may be seated.

### (BENCH CONFERENCE 4:38:15 PM)

30

**THE COURT:**

All right.

**BAILIFF:**

Is this polling?

**THE COURT:**

No, the polling sheets are right here.

**MR. BURGET:**

Hold on just a second.

**THE COURT:**

Just hold on, Mr. Jim?

**BAILIFF:**

Yeah.

**THE COURT:**

One for your review. Mr. Burget?

**MR. BURGET:**

Here we go.

**THE COURT:**

Back page? Proper to form and everything, gentlemen?

**MR. BURGET:**

Yeah.

**THE COURT:**

All right. Polling sheets. At this time, I'm going to have the Bailiff to give out the polling sheets to have them returned, too, and have y'all return them back to the Bench.

**MR. HICKMAN:**

Don't you announce the verdict first and then poll them?

31

**THE COURT:**

Sir?

**MR. HICKMAN:**

Don't you announce the verdict first, then poll them?

**(END OF BENCH CONFERENCE 4:38:58 PM)**

**THE COURT:**

Mr. Burget, announce the verdict first, then polling, or how do you wish to - -

**MR. BURGET:**

Poll first, Your Honor.

**THE COURT:**

All right. Thank you. If you will give those - - give out to the - - 12 sheets.

**BAILIFF:**

(Unintelligible) to the back.

**THE COURT:**

And they have the pencils, right there. Look right there.

**BAILIFF:**

Yeah.

**THE COURT:**

Ladies and gentlemen, the attorneys have requested a polling of the Jury. Please - - and a seal of the results, Mr. Burget and Mr. Hickman?

**MR. BURGET:**

Yeah, why don't we give the instructions to the Jury first and then we can seal it after we get the results, Your Honor.

32

**THE COURT:**

Okay.

**MR. BURGET:**

Do you want to instruct the members - - it's my understanding there's a polling form that has the name of each Juror on that.

**THE COURT:**

Yes. Each - - each form has a name on - - your respective name, if you will.

**MR. BURGET:**

So, to make sure that we have - - each Juror gets the proper one.

**BAILIFF:**

The ones for the front?

**THE COURT:**

I don't know - - I thought - - oh, I'm sorry, front row. I'm sorry. Sorry about that. I had another list. See if that's right there.

**MR. BURGET:**

Yeah, if you want to instruct the Jurors on how to - - I think the form's pretty self-explanatory. If you want to instruct the Jurors on how to fill out the form.

**THE COURT:**

I believe it's a place for each for individual [sic] - - I don't have one in front of me to show you an example - - with your name and with your verdict, yes or no.

**MR. BURGET:**

Correct, Your Honor. And, Your Honor, I don't think we put this on the record earlier, but Ms. Yolanda Gray is the fore - -

**MR. HICKMAN:**

He's trying to hand you those right there.

33

**MR. BURGET:**

Well, - - well, I can't - - I can't take them. Mr. Jim, you've got to take them.

**THE COURT:**

It - - just hand - - handed down to Mr. Jim Boyd.

**MR. BURGET:**

Ms. Yolanda Gray was the foreperson of - - of the Grand Jury - - excuse me, of the Petit Jury.

**THE COURT:**

Right. As per the Jury verdict, Yolanda Gray is the foreperson of this Jury.

**MR. BURGET:**

Yes.

**THE COURT:**

So noted for the record. Thank you, Mr. Burget. Appreciate it. All right, gentlemen, will you approach, please?

**(BENCH CONFERENCE 4:41:40 PM)**

**THE COURT:**

All right.

**BAILIFF:**

I believe that top rows [sic] on the top.

**THE COURT:**

Okay.

**MRS. LIPSEY:**

There should be some alternates. Alternates.

**THE COURT:**

Huh?

34

**MRS. LIPSEY:**

Alternates.  You want to get those out.

**THE COURT:**

All right.  I'm going to put these outside.  They weren't in there, right?

**MR. BURGET:**

They were.

**THE COURT:**

They shouldn't have been in there, the two alternates.  Yeah.  Is that all?

It is the latter portion of the colloquy that appellate counsel notes as possibly indicating the alternate jurors participated in the jury's verdict.  Having reviewed the entire colloquy above and below this exchange, we find that Mrs. Lipsey was referring to the polling slips for the alternates, not the alternates themselves.  Since the polling slips had the jurors' names printed on them, the clerk presumably printed some with the alternate jurors' names in the event they were called to serve on the jury.  As previously indicated, both parties agreed that when the principal jurors returned with their verdict, there were twelve jurors.  Furthermore, the colloquy further indicates that the alternates were separated from the principal jurors.

After the trial judge and the attorneys counted the individual juror's votes and determined there were twelve, the following colloquy ensued:

**THE COURT:**

If no one objects, I'm going to have the two alternates come out to read the verdict - - hear the verdict?

**MR. HICKMAN:**

Well, they can come out.  They're not on the panel anymore.  I don't think they're allowed to sit over there anymore.

**MR. BURGET:**

Yeah, they can seat [sic] in the audience, Your Honor.

**THE COURT:**

All right.  They can sit in the audience.

**(END OF BENCH CONFERENCE 4:43:52 PM.)**

**THE COURT:**

Mr. Bailiff, if you will, before the verdict is read, if you'll have the two - - let's go back, Akierah, the sound noise off, please.  Thank you.  I can't hear.  The two alternates to return to the audience, please, two alternates back from the back.

After the verdict was read, the State noted that the verdict was a valid twelve out of twelve verdict.

*Jurisprudence*

Addressing a similar assigned error, this court stated in *State v. Mouton*, 94-1074, pp. 8-9 (La.App. 3 Cir. 3/27/96), 672 So.2d 192, 196-97:

> Generally, an alternate juror's participation in jury deliberations constitutes an extraneous influence on the jury which establishes a *prima facie* case of prejudice to the defendant and constitutes reversible error.  See *State v. Howard*, 573 So.2d 481 (La.1991).  A verdict returned by a jury composed of either more or less than the correct number of jurors is null and void.  *State v. Smith*, 367 So.2d 857 (La.1979); *State v. Nedds*, 364 So.2d 588 (La.1978).  An error in the size of a jury is discoverable on the face of the record *ex proprio motu* without formal objection under La.Code Crim.P. art. 841 or assignment of error.  *Smith*, 367 So.2d 857.

> In the case *sub judice,* Mouton's assertions that the district court failed to dismiss the alternate juror and that the alternate juror improperly participated in the jury deliberation are not supported by the record.  The minutes clearly reflect that the alternate juror was dismissed: "The Court thanked and excused the alternate juror in this matter at 12:08 p.m. and thereafter the Jury retired to the deliberation room to consider the case before them, and the Court recessed."  Furthermore, the transcript of this case does not contain any affirmative statement or entry showing that the alternate juror remained or that the alternate juror participated in the jury deliberation.  While the transcript prevails over the minutes when there is a discrepancy between the two,

36

in this case, there is no discrepancy between the minutes and the transcript. The transcript of the case *sub judice* contains no statement or entry which contradicts the minutes. See *State v. Lynch*, 441 So.2d 732 (La.1983).

We also note that the defendant voluntarily waived polling of the jury under La.Code.Crim.P. art. 812 when the jury returned from deliberation to present its verdict. If the district court had not dismissed the alternate juror in this case and the alternate juror improperly participated in the deliberation of the jury, then the defendant could have polled the jury when it returned to deliver its verdict so that affirmative proof of the alternate juror's alleged presence and participation in the deliberation would have appeared in the transcript of the record. Accordingly, Mouton should not be allowed to benefit from his voluntary waiver of a procedural device intended for his protection. Therefore, absent any positive proof in the record showing that the alternate juror participated in the jury deliberation in the present case, this *pro se* assignment of error lacks merit.

In the present case, the minutes indicate the two alternates were released under the rule of sequestration, and the twelve jurors were released to the jury room for deliberation. The court minutes further indicate that the jury was polled, and twelve out of twelve jurors concurred in the verdict. As discussed above, the transcript also indicates the two alternate jurors were sequestered to the judge's chambers while the "first 12" deliberated. As this court found in *Mouton*, the record in the present case is absent of any positive proof that the alternate jurors participated in the jury deliberation. To the contrary, a careful reading of the entire record indicates the alternates did not participate in the deliberation. Thus, we find that there is no need to remand this case for an evidentiary hearing as Defendant requested.

For the foregoing reasons, we find this assignment of error also lacks merit.

**ASSIGNMENT OF ERROR NO. 4:**

Instead of addressing the ineffective assistance of counsel claims as a separate assignment of error, we have addressed the claims with the pertinent assignments of

37

error.  As discussed in the previous assignments of error, we have found no merit to Defendant's assertion regarding ineffective assistance of counsel.

## DECREE

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**